



United States District Court
Southern District of Texas
FILED

AUG 0 2 2001

Michael N. Milby
Clerk of Court

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| FRANCISCO R. RODRIGUEZ | § | |
| Plaintiff | § | |
| | § | Cause No. B-95-150 |
| VS. | § | Civil |
| | § | |
| UNITED STATES POSTAL SERVICE, | § | |
| ET AL | § | |
| Defendants. | § | |

**PLAINTIFF'S ADDED SUPPLEMENTAL/BRIEF TO PLAINTIFF'S THIRD AMENDED PETITION AND ADDED RESPONSES TO DEFENDANTS' MOTIONS TO DISMISS; AND RE-URGES HIS (1) PARTIAL SUMMARY JUDGMENT; (2) BACK PAY/FRONT PAY; (3) GENDER/SEX/AGE-BASED DISCRIMINATION; AND (4) RETALIATION CLAIMS; AND PLAINTIFF'S RESPONSES TO DEFENDANTS' MOTIONS TO DISMISS, REASSERTING AND REURGING HIS: (1) PARTIAL SUMMARY JUDGMENT; (2) CLAIMS AGAINST INDIVIDUAL DEFENDANTS; (3) CLAIMS UNDER 18 U.S.C. § 1709; (4) CLAIMS OF EMOTIONAL DISTRESS AND ANXIETY; (5) CLAIMS OF DEFAMATION; (6) CLAIMS OF INTERFERENCE WITH PROTECTED PROPERTY INTEREST; CLAIMS UNDER 1983; (7) ALL CONSTITUTIONAL TORT CLAIMS; PLAINTIFF'S SUPPLEMENTAL AMENDED-CLAIMS FOR PECUNAIRY/NONPECUNAIRY RELIEF; AND URGES CASE IS RIPE FOR SUBMISSION TO JURY ON THE MERITS.**

TO THE HONORABLE U.S. MAGISTRATE JUDGE JOHN W. BLACK:

COMES NOW, FRANCISCO R. RODRIGUEZ, Plaintiff in the above-numbered

and entitled cause, with the added supplemental pleading/brief, and added supplemental

amended-claims for pecuniary/nonpecuniary relief to the third amended complaint; and

plaintiff's added responses and brief to the defendants' continuing motions to dismiss and

for summary judgment; and plaintiff's added response to the defendants' continued

failure to respond to many of his complaints and claims; especially to the continuing

procedural and criminal respects; and reasserts and reurges his claims against the

individual defendants, and directs to the Court's attention, that this is not a run-of-the-

1

mill civil case, but a case of abuse of power and authority, and accountability with all the

implications of penal culpability, which plaintiff has asserted and argued many times, but

as a layman/pro-se, he has been given a deaf-ear; and in support therefor, would

respectfully show the Court as follows:

I. SUPPLEMENTAL PLEADING/BRIEF, AND AMENDED-CLAIMS FOR
   PECUNIARY/NONPECUNAIRY RELIEF

A. Plaintiff incorporates by reference brief dated 9-19-2000, that was filed without

obtaining leave of Court as an ex-officio brief, since all parties and the Court have copies

of same, which contain numerous exhibits that are to be used in subsequent proceedings

(pre-trial and trial), with the same as if fully copied and set forth at length herein; noting

that including them in this brief will unnecessarily enlarge this brief, with the same

intention substantially served.

B. Plaintiff would add Supreme Court case, (Pollard v. E.I. du Pont de Nemours &

Co., U.S., No. 00-763, 6/4/01), to the caselaw cited in prior pleadings/briefs, and in the

Court's file; Citing the summary and analysis published by the Bureau of National

Affairs (BNA) on 6-5-01, and noting that the full text is attached herewith as Px-0047,

incorporated by reference the same as if fully copied and set forth at length herein.

Employment Discrimination – Damages

**Front Pay Isn't Subject to Damages Caps
In Federal Employment Discrimination Suits**

Front pay is not an element of "compensatory damages" within meaning of
1991 Civil Rights Act, 42 U.S.C. § 1981a, and thus is not subject to statutory
caps on damages in 42 U.S.C. § 1981a(b)(3).

Front pay awards in federal employment discrimination suits are not
subject to the 1991 Civil Rights Act's caps on compensatory damages, a
unanimous Supreme Court held June 4, settling a circuit split (Pollard v. E.I du
Pont de Nemours & Co., U.S. No. 00-763, 6/4/01).

2

The court explained that the 1991 Act by its own terms created remedies "in addition to" relief already authorized by Section 706(g) of the Civil Rights Act. Because front pay was already available under Section 706(g), it should not be deemed "compensatory damages" governed by the 1991 Act's damages caps, Justice Clarence Thomas said.

The district court found that the plaintiff employee was subjected to flagrant co-worker sexual harassment of which her supervisors were aware. It awarded her $107,364 in back pay and benefits, $252,997 in attorneys' fees, and $300,000 in compensatory damages. It stated that the latter sum was "insufficient to compensate plaintiff" but was dictated by Sixth Circuit precedent holding that front pay is an element of compensatory damages subject to the sliding scale damages caps in 42 U.S.C. § 1981a(b)(3), which increase with the size of the employer. The Sixth Circuit affirmed. Five other circuits had found front pay not subject to the caps.

Reversing, the Supreme Court explained that front pay "is simply money awarded for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement." That form of damages has long been available under the National Labor Relations Board's interpretation of "back pay" as used in Section 10(c) of the National Labor Relations Act, on which Section 706(g) of the 1964 Civil Rights Act was modeled, the court said. When Section 706(g) was amended in 1972to authorize award of "any other equitable relief as the court deems appropriate," courts responded by allowing awards of front pay as a way of making employees whole, especially when reinstatement was not a viable option.

**Statute Must be Read as Whole.** With the 1991 Civil Rights Act, Congress "further expanded "the remedies available in cases of intentional discrimination to include compensatory and punitive damages, the court said. Under Section 1981a(b)(3), compensatory damages may be awarded for "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses," subject to the damages caps.

"In the abstract, front pay could be considered compensation for "future pecuniary losses,' in which case it would be subject to the statutory," the court said. But reading Section 1981a "as a whole" precludes that interpretation, the court said.

The court focused on 1981a(a)(1), which provides that compensatory and punitive damages may be recovered "in addition to the relief authorized by section 706(g) of the Civil Rights Act of 1964," and Section 1981a(b)(2), which provides that compensatory damages "shall not include backpay, interest on backpay, or any other type of relief authorized under" Section 706(g). Accordingly to these statutory provisions, if front pay was a type of relief authorized under § 706(g), it is excluded from the meaning of compensatory damages under § 1981a, " the court said.

Citing the long-standing interpretation of section 10(c) of the NLRA on which Section 706(g) was based the court concluded that front pay to compensate for lost pay between the time of judgment and reinstatement was previously

available under Section 706(g) and thus is not subject to the Section 1981a(b)(3) caps. The court saw "no logical difference" as to front pay awards made in lieu of reinstatement. Treating them differently, it said, would lead to the "strange result" of letting the "most egregious offenders" off the hook for front pay when ongoing hostility or psychological injuries preclude reinstatement.

Plaintiff would show the Court that he believes the "signpost" of demarcation under Pollard's reference to "front pay" should be determined by a fact-finder such as the Court or the jury, however, he argues that signpost should be "downstream" from his date of retirement, October 2, 1992, especially in light of the ongoing grievances and EEO complaints that continued on through retirement (which was probably infirm insofar as a legitimate employment action, but for the misconduct and conspiracy by defendantsn against plaintiff). Plaintiff suggests a "signpost" of January 25, 1995, because of the number of issues that were "on the table" for that arbitration or semi-arbitration. Plaintiff believes that back pay and "front pay" should be calculated on that basis.

II.  Plaintiff's Preliminary Statement Regarding His Supplemental Pleading/Brief, and Supplemental Amended-Claims for Pecuniary and Nonpecuniary Relief; and Analysis and Summary of the Case

A. Plaintiff points to Docket No. 91, by respectfully urging the Court for a judicial review of plaintiff's pleadings/briefs in the Court's file, and the pleadings/brief herein, and applicable case law for plaintiff's claims, and reconsideration of the Court's adverse opinion and dismissal of several of his claims; with specificity, claims # 1 through #6, which include two (2) # 5's of Docket No. 91. Plaintiff respectfully urges the Court to focus on the circumstances of litigants' actions and inaction, and the  credibility and legitimacy of their allegations of misconduct and wrongdoing.

B. **FACTUAL AND PROCEDURAL BACKGOUND**

CSUPDF - www.fastio.com

Plaintiff directs the attention of the Court, by showing he was employed by the United States Postal Service (USPS) in 1966, and worked for well over two decades, and also, with as many years, as local president of the American Postal Workers Union, AFL-CIO (APWU), the exclusive bargaining agent for the clerk craft (as applicable in this lawsuit) [in 1983, plaintiff was awarded a dual-level, level-5 (L-5)/level-6 (L-6) full-time regular (FTR) ranked-Vehicle Operations Maintenance Assistant (VOMA)] clerk duty assignment Px-22, without ever being accused of wrongdoing. Plaintiff directs the Court's attention to grievance decision Px-20, by showing that the APWU filed a class-action grievance, by plaintiff, then local president, relieving and relocating then PTF-defendant Martinez from a "ready-made" FTR assignment which had been created for her by Charles J. Krause, then Superintendent of Postal Operations (SPO), her former supervisor, in an apparent "instant-upward-mobility" plan for defendant Martinez. Plaintiff would show that in 1987, defendant Martinez returned to Harlingen, as postmaster/decisionmaker, with a deep-seated vengeance in mind; and a motive, a plan and intent, against plaintiff, and immediately shortly thereafter, defendant Martinez commenced with a plan of retaliation, consisting of a pattern of abuse, harassment, intimidation, and continuous fabricated misconduct allegations against plaintiff. Plaintiff would show that defendant Martinez' actions against him, as APWU President, were economically-targeted, especially concentrating on his VOMA assignment, entitled overtime (OT), and other entitlements that he achieved through his USPS employment, to harm him and cause him financial ruin discussed in prior pleadings/briefs incorporated by reference the same as if fully copied and set forth at length herein. Plaintiff points to his awareness of the defendants' *modus operandi* (MO), especially defendant Martinez'

enormous power and undue influence over her superiors, and especially with the postal

inspectors; and defendant Martinez' adversarial behavior towards plaintiff, unlike her

predecessors; in which she never had the courtesy to bid plaintiff the grace of day, and

the disrespect she had for him as an employee/APWU-union officer, which plaintiff took

her comportment very serious, coming from his top local manager; by showing that this

behavior motivated plaintiff to keep handwritten/typewritten notes and memos of the

defendants' actions and inaction against him, and the examples of the many different

devious ways of attempts to discipline him, such as intentional delay of mail and

improper registered mail-handling "entrapment", instigated by defendant Martinez

[manipulating her subordinates, and by pitting plaintiff's compromised/rewarded (bought

with OT & preferred assignments, and other benefits of mutual interest to defendant

Martinez and her favorite employees) coworkers, to promote her vindictive agenda

against him], which contained false allegations of wrongdoing against plaintiff, to issue

him discipline, or have him fired, discussed in prior pleadings/briefs incorporated by

reference the same as if fully copied and set forth at length herein.  Plaintiff would

summarize examples of the continuous provocative and adverse actions against him,

becoming more pronounced in 1991, that led to his constructive discharge:

> a). 4-15-88: plaintiff points to the meticulous VOMA-related record-keeping
> oppressive work schedule Px-32, assigned to him, which was intended to elicit
> resistance from plaintiff and accuse him of disobedience, of which plaintiff settled
> at step1, CBA Article 34 grievance, which was the commencement of the
> continuous VOMA-related pattern of retaliation, and plaintiff's purported alleged
> misconduct, discussed in prior pleadings/briefs, by showing defendant Martinez'
> main "theme" to intimidate and provoke plaintiff, and incite illegitimate
> arguments with him;

> b). 4-29-88: plaintiff points to letter of warning (LW) Px-16 (VOMA-related)
> issued to him; by showing defendant Martinez was ever-conscious and readily
> acknowledged, the APWUs' grievance Px-20, noting defendant Martinez' step 2

LW grievance-denial response, stating that, "Mr. Rodriguez (plaintiff) represented the APWU members well, for over ten years." In the LW she alleges that "Mr. Rodriguez did not show SPO Rocha how he (plaintiff) completed the 4570's"; which he had done for over 5-plus years as required by regulation, please see excerpt from Vehicle Maintenance M-52, part 213.123; by showing the 4570 issue was a ruse, and the beginning of a ready-made "failure to follow instructions and direct orders", accusation;

c). 1-17-91: plaintiff points to letter Px-0050 from APWU local president Francisco Rodriguez to Postmaster Martinez, in which he complains about SPO Rocha's interference with his union business and of being harassed and humiliated in front of coworkers; and by showing that defendants Martinez and Rocha were pressuring him for an opportunity to discipline him;

d). 2-12-91: plaintiff points to handwritten letter to Postmaster Martinez, with copy mailed Vehicle Maintenance Facility (VMF) and complains of arrearage in plaintiff's duties, by showing that thereafter, defendant responded with a letter to all clerks, dated 2-15-91, advising them that "defendant Rocha is their immediate supervisor" Px-  ;

e). 5-13-91: plaintiff points to a devised "home-made" sign out/sign in log Px-69G, (VOMA-related) which was not posted office-wide to all employees, nor was it a standard policy, by showing a violation of Article 34 of the CBA (with prior a similar violation occurrence, please see (#a) above ), which plaintiff grieved by grievance #05-2403 Px-70D, noting that on step 2 appeal, defendant Martinez', two operative responses regarding the sign-out/sign-in log Px-69G, and Px-68L which was designed for plaintiff to sign, with an intent to be discussed further, stating in pertinent part(s) a). " A sign-out time log was developed to keep **track** of all employees leaving the premises", and b). "grievant did not follow instructions"; thereafter, plaintiff filed EEO #3-U-1244-92;

f). 8-8-91: plaintiff points to co-workers John Karst and 204-B James Santa Ana, fabricating allegation of harassment by plaintiff, and by showing defendant Martinez' quick response, by calling defendant Bazaldua and San Antonio District Employee Labor Relations representative (ELR) to investigate, to which they responded, but came to intimidate and threaten plaintiff with his job Px-59;

g).2-21-92: plaintiff points to letter Px-23A from APWU local president Rodriguez to Postmaster Martinez and complains to her about her threats and intimidating behavior, in which she ran president Rodriguez out of her office, and he related her actions to Acting SPO Cortez (defendant) taking its toll on president Rodriguez.

h).8-13-92: plaintiff points to step 1 of grievance #2-8131, by showing that on his return to duty on 7-18-92, defendant Martinez abolished his VOMA duty assignment Px-68Q; thereafter, filed EEO#3-U-1604-92;

7

1. April 1999: alleged report of mail theft on Mr Rada's route #71, thereafter, three and a half to four months later;

2. 7-19-99: PI Orona and Britt allegedly prepare two (2) first-class letters on Mr. Rada's route; PI's exhibit #1; addressed to M/M T. Valencia, 806 E. Jackson #1, Harlingen, TX, with return address of 18622 Sandelford Drive, Katy, TX 77449, the letter allegedly contained $25 cash and a greeting card;  PI's exhibit #2; addressed to Consuelo Perez, 1122 E. Van Buren St., Harlingen, TX 78550, with return address of 7615 Sunset Blvd., L.A. Calif. 90046, the letter allegedly contained $17 cash and a greeting card; allegedly on 7-**20**-99, allegedly at 1:00 a.m. the PI's took both letters to Linda Lee Vonville, Supervisor, McAllen, TX post office for Harlingen dispatch; plaintiff skips No(s) 3, 4, 5, which plaintiff believes are unnecessary at this point, as he will discuss and proceeds the last sentence of No. 6, which states, "Martinez advised that Rada might be at the American Legion Hall ….". plaintiff proceeds to No. 7 ;

7. (plaintiff : Mr. Rada is picked up at the American Legion Hall). ………. "Orona searched Rada before transporting him to the post office for interview."

8. (plaintiff : en route to the post office the PI's note the denominations of Mr. Rada's money-bills, without his knowledge, and the PI's selected the bills they wanted, and) … IM "…retained as evidence and the remaining bills ($78) in Rada's possession were returned to Rada."

Plaintiff points and discusses PI's Exhibit #1: is as described by the IM, by showing that

the only problem lies in reconciling the Houston, TX 7-17-92, post mark and mailing

office, with the alleged 7-20-99 McAllen mailing date, PI's Exhibit #2: is as described by

the IM, and there again, the problem lies in reconciling the L.A. Calif., 7-16-99 post mark

and mailing office, with the alleged 7-20-99 McAllen mailing date, with the absence of

the McAllen post office mark, and the mailing post office date, the PI's offered him a

deal, while he had a grievance ongoing, violated his rights and pleaded guilty, without

giving him the opportunity to exhaust his administrative remedies Px-0065.  Plaintiff

cites, McNair v United States Postal Service  768 F.2d 730 (1985), this case is about that

allegedly stole a radio, to which he denies, it was planted; analogous to the cases in the

Harlingen post office, re: Mauro Rosales, in his case he was denied his rights, and the PI

went and got a box of fruit juices outside of presence, and made him sign for it; plaintiff

cites those cases analogous to plaintiff's case, referring to EEO-1604, whereby in the this

case he was assigned to go out in the street to perform letter carrier duties "with his

beeper on", akin to McNair, but plaintiff's beeper didn't "beep", however in the case of

registered letter R 563 404 954, the "beeper" did "beep", when defendant Perez, the last

employee to have custody, apparently gave it to defendant Martinez, and defendant

Bazaldua affirmed she committed no crime, inconsistent with postal regulations and 18

U.S.C. § 1709, but for bring management "entrusted with the very service they are to

protect", a deaf ear has been turned, including the Government counsel citing Px-71A1;

Plaintiff, as a former government employee is familiar with the code of ethics, and would

use the analogy of government employees entrusted with their particular duty and see in

the media; a Drug Enforcement Agent (DEA) is entrusted with enforcing eradicating

illegal drugs, and he is caught selling drugs, convicted and sent to jail; an immigration

inspector entrusted with the duty of curtailing illegal entries; he is caught and sent to jail;

but in our case a Government attorney/prosecutor is entrusted with the duty of enforcing

the laws of the Constitution,

 Plaintiff has maintained throughout this entire case that defendants' misconduct

towards plaintiff was part of a recurring pattern of discrimination and abuse of employees

who were not favored by Harlingen management, and plaintiff cites several examples

of the recurring pattern by Harlingen USPS management to show a higher degree of

culpability by defendants, especially higher management, that was aware of the ongoing

nature of the pattern, but not limited to the following: Amanda Torres, false claims of

shortage of funds, removed, but finally refunded the money; plaintiff's actions in 1991 and 1992; Mauro Rosales, framed/no due process, removed but not reinstated 1993; Blanca Pina, removed multiple times, and reinstated, each time, 1993; Lupe Sanchez, removed April, 1993, framed/no due process, reinstated; . . . . Bobby De La Fuente, removal then reinstated; Antonio Rada, framed, removed, taken to Court while grievance was ongoing, coerced by USPS.

Plaintiff points to defendant Martinez' power and ability to manipulate and compromise his coworkers by compensating them with overtime, preferred assignments, acting supervisor (204-B), to promote her agenda against him, which became more pronounced in 1991 to get him fired by showing; the many examples of attempts to set him up; (1) intentional mail delay Px-68S1, and Px-70A; (2) attempts of mishandling registered mail Px-68S, Px-68V, and Px 68Y, of which he complained early on, since 1989 to the postal inspectors, but his complaint was ignored.  Plaintiff would show that PTF-defendant Perez was "planted" and assigned to a FTR preferred assignment known as the "cage" in the same assignment area with plaintiff with access to the mail security vault, containing incoming/outgoing registered mail, which plaintiff also handled, noting that this assignment area and plaintiff's desk many times contained delayed mail which was in plaintiff's custody, was directly in front and in full view of the "surveillance" post. Plaintiff would show that on 3-19-92, he complained to defendants Galvan and Cortez of about a half tray of unprocessed mail being delayed and held in his possession on his desk, because of the consequences plaintiff would suffer if found with delayed mail on his hands, please see ELM part(s) 666.1; 666.85; 666.86, discussed in prior pleadings/briefs; plaintiff would show that on the morning of 3-26-92, defendant Perez,

assigned from his custody, Restricted-Delivery registered letter No. R 563 404 954 Px-71A, to casual city letter carrier Robert Cantu Px-0056, addressed to plaintiff at his residence at 719 Citrus Terrace, Harlingen, TX, and in evening defendant Perez, relieved carrier Cantu of the registered letter responsibility; then again on the morning of 3-27-92 defendant Perez assigned the letter to FTR letter carrier Rick Gomez Px-0057, being followed by defendant Cortez to supervise the delivery of plaintiff's registered letter, and in the evening defendant Perez relieved carrier Gomez of the registered letter responsibility, with defendant Perez retaining the registered letter responsibility and chain of custody Px-0027, pursuant to Domestic Mail Manual (DMM) **911.11 Purpose**:

> Which states in pertinent part, "The registered mail system provides added protection ... for important mail. .. Registered mail is the most secure service the Postal Service offers.

> Plaintiff would show that on or about, or as late as 3-31-92, defendant Perez had

official custody of the registered letter at issue and released it, without proper and official disposition to defendant Martinez; and in which defendant Martinez defaced the

[Plaintiff points out that on 3-31-92 the MSC received the OWCP claim Px0055 plaintiff had mailed to OWCP office in Dallas, with a copy to the MSC on 3-26-92, the domicile offices of Postal Inspector(s) Figueroa and Wuenchel; and defendants Hernandez, Lopez and Bazaldua; at which time defendants Martinez and Cortez made a conscious decision to fire plaintiff Px-71E; thereafter, they removed the registered letter from the mail flow containing the original letter of plaintiff's removal action, which was based on "mistreatment of mail/registered mail and delay of mail", which plaintiff fowled-up for them by reporting the half tray of unprocessed mail left on his desk and the loose (bait) registered mail in his work area, apparently by defendant Perez] letter and its attached return receipt PS Form 3811, and illegally endorsed the letter "wife refused to sign" Px-71A, noting that the letter was restricted-delivery for delivery to plaintiff only, **please see**, DMM 933.1; and Statute 18 U.S.C. § 1709, defendant Bazaldua manipulated MSC Personnel Assistant Carmen Cantu, into a cover up of defendant Martinez' wrongdoing, stating "there are no PS Form 3849" on the registered letter Px- . **Please see**: DMM 115.1; 912.62a; 62c; 62d; 62e; 62f; 913.721a].

Plaintiff is aware that he has no standing to prosecute defendants regarding their criminal culpability on the R 563 404 954 Registered letter of March 26,1992; however, since the U.S. Attorney's office has consistently refused to take any action with regard to enforcement of criminal offenses alleged by plaintiff, plaintiff is still seeking civil sanctions for said criminal culpability as a private "attorney general," analogous to environmentalists acting as private "attorneys general" in civil actions for various environmental violations.

1. <u>FACTUAL ASSERTIONS</u>

a. It is undisputed that defendant Martinez distanced herself, from the responsibility as postmaster/installation head, in dealing with the APWU, and relied on her subordinates, manipulated/compromised and detailed plaintiff's coworkers, and assigned them to acting supervisor (204-B) assignments, to harass and intimidate him, per examples, Px-23; Px-24; Px-65; Px-67E; Px-61F/Px-109; Px-71G; Px-71M, Px-0020/Px-0025. please see **CBA** Article 15. Section 2. Step 2 (c);

b. It is undisputed that defendant Martinez removed defendant Rocha from his SPO position on or about mid-December of 1991, for being unsuccessful in firing plaintiff as per some examples Px-16; Px-32, Px-62; Px-11, and replaced him with defendant Cortez, and kept him only for the duration of his fallacious and fabricated allegations against plaintiff in April of 1992 Px-13.

c. It is undisputed that defendant Martinez possessed undue influence over her superiors, especially MSC and PI's, and was employed by the USPS on 2-16-74, and was assigned a FTR BU position on 4-13-74 Px-20, barring probationary period and BU

qualifications standards, on an instant-upward mobility plan, please see **CBA** Article

12.Section 1.A.; **ELM** 312.1; 378.1.

    d. It is undisputed that the knowledge, skills, resources, and capabilities, for

fashioning disciplinary action charges, as in the instant case, are non-existent at the

Harlingen USPS, and defendant Martinez relies on the MSC filed a union grievance Px-

20, that disrupted PTF Mary Munoz (defendant) Martinez' "ready-made-FTR position"

in the Harlingen USPS, created by SPO Charles J. Krause, her former supervisor, which

grievance relocated her back to the Weslaco post office, of which she resented with a

deep-seeded vengeance in mind, and upon her return to the Harlingen post office, as the

postmaster/decisionmaker, and in less than one year, she immediately commenced her

retaliation against the APWU and plaintiff, beginning with a LW dated 4-29-88 Px-16;

and in her LW, step 2 grievance denial, she was ever conscious of the APWU Px-20

grievance, and readily acknowledged that Mr. Rodriguez represented the APWU

members well, for over ten years, in the LW she alleges that Mr. Rodriguez did not show

SPO Rocha how Mr. Rodriguez completed the 4570's, an elementary procedure in the

preparation of the VOMA "End of Accounting Period" report; which Mr. Rodriguez had

been doing, and were reviewed by an supervisor before submission to the VMF, for the

prior 5-plus years, please see excerpt from M-52, part 213.123, the 4570 was a ruse, and

the beginning of a ready-made "failure to follow instructions and direct orders",

retaliation pattern

**NOTE**: DUE TO PLAINTIFF'S VOLUMINOUS DOCUMENTS/RECORDS, AND
      EXHIBITS, MANY WILL BE SUMMARIZED WITH THE ACTUAL
      EXHIBITS MADE AVAILABLE ON OR BEFORE TRIAL.

A.  PLAINTIFF'S INTERACTION WITH DEFENDANTS, MOSTLY AS A.P.W.U.
     PRESIDENT, INVOLVING DISCRIMINATION/RETALIATION AGAINST HIM.

Plaintiff would show that the defendants' argument is that the only issue(s) remaining to be resolved, in the case sub judice are;  (1) the issue of  EEO 1376; and (2) the issue of BP.  Plaintiff disagrees, and contends that EEO 1376 and BP are far greater than the defendants pretend them to be, and are only a meager and minute part of the defendants' gross misconduct and malevolent wrongdoing, and are arguing EEO(s) 1244 and 1604, devious intention of diverting the Court's attention from the issues of the defendants' discrimination against him , which are age, gender-sex, and the APWU union activity discrimination against him which have been at the forefront of plaintiff's complaints and claims that gave rise to this lawsuit, and the consequential damages suffered thereof, by plaintiff.

Plaintiff  points to Cindy Martinez, McAllen APWU President, representing Harlingen APWU Local President Francisco Rodriguez' LR, with grievance No. CMFR4-17-92 by showing (excerpts from grievance moving papers), that she appealed to step 2 on 5-12-92, and to step 3 by 6-1-92, alleging union activity nexus, and President Cindy Martinez, cites: that President Rodriguez is well respected in the post office and the community

Plaintiff would show that under the new Postal Reorganization Act of 1970 (PRA), he was elected APWU Local President and was committed to enforce the CBA, as he demonstrated by example letter(s) dated 9-13-73 from Thomas A. Neill, National Vice President, Clerk Craft, to Harlingen APWU Local President Francisco R. Rodriguez, regarding the USPS non-compliance with two FTR positions that had been agreed upon through a maximization grievance Mr. Rodriguez had filed, for the mutual benefit of the APWU and the efficiency of the Postal Service, and also in the same communication, a

CMxPDF - www.tex.txsa.com

response to his complaint of BU work performed by local management, to a previous

complaint by President Rodriguez Px-71J. By letter dated 3-12-76 from Irving A.

Domingue, APWU Regional Representative Clerk Craft, to Gilbert Reyes, San Antonio

USPS, ELR Asst District Manager, in which President Rodriguez requested compliance

to two pre-arb decisions of BU in the Harlingen post office Px-71K. APWU Local

President noticed, and became concerned early-on, that defendant Martinez, since

becoming postmaster in late 1987, began taking unilateral action in the BU. President

Rodriguez by letter dated 4-12-88, to Postmaster Martinez shared some of the NLRA

bargaining information with her, for a better understanding, regarding her unilateral

assignment of a former Los Fresnos postmaster into the Harlingen BU Px-0052. Plaintiff

would point to example of letter(s):  a). by step 2 grievance settlement dated 5-17-89,

Harlingen SPO Rocha meets with union President Rodriguez to discuss the adverse

behavior of 204-b Linda Galindo Px-0051; and b).

c). by step 2A grievance disposition, dated 6-16-89, regarding window clerk Richard

Laughlin's flexible credit discrepancy, which requested APWU Local President, to

investigate clerk Laughlin was told not to go to the APWU, but to go to him if he had any

problems Px-89-0424S; d). by letter dated 9-30-89, from SPO Rocha to General President

Francisco Rodriguez, Harlingen APWU, by showing that President Rodriguez had

become a problem with Mr. Rocha, for exercising his duties as local union president Px-

51A/Px-65. Plaintiff would show by examples Px-71Q, Px-71M, Px-71O, Px-71R, and

Px-67E with attachment, please see CBA Article 15.Section 2.step 2(2), that defendant

Martinez would consistently distance herself from her postmaster responsibilities, to

avoid meeting with APWU Local President Rodriguez.  Plaintiff points to step 2

decisions, dated 6-7-91, by showing that defendant Rocha would retaliate against the
APWU, by reducing the rest breaks from 15 minutes to 10, the reduction was directed to
President Rodriguez, bur Rodriguez grieved as an APWU class-action Px-56.  By letter
dated 1-10-92 from Francisco Rodriguez, APWU Local President to Archie Salisbury,
APWU Regional Coordinator, in his letter President Rodriguez describes the adverse
actions by defendant Martinez against the APWU Local, and President Rodriguez'
commitment to the APWU.  Enclosed with the letter to Coordinator Salisbury is the
resolution of the 1991 LMOU Impasse appeal in which fixed off-days and rotating off-
days basic workweeks were resolved, and in the enclosure is the identical Impasse issue
President Rodriguez had appealed from the 1981 LMOU to arbitration, resolved and was
withdrawn from arbitration by National Vice President Thomas A. Neill Px-0068.

Plaintiff, with the Court's indulgence, would like to share excerpts on page four of
Px-125, regarding National APWU President Biller's testimony before Congress, and
considered instructive and analogous to our case:

> "'And despite the employees' appeals to postal officials, representatives of Congress,
> EEO counselors, and the initiation of grievances, the problems are unabated".
>
> "Tom Mastas is the former President of Northeast Massachusetts Area APWU Local
> and a postal employee for more than18 years.  He was notified of his removal in May.
> Mr. Mastas communicated to management officials at his worksite regarding the
> hostile work environment in which he worked every day.  ......Everyone from the
> postal inspectors to the employees in the workroom floor acknowledged the myriad
> of problems in the worksite.  Management response was simply to fire the union
> activist".
>
> "James Franklin is the President of the Lynchburg, VA APWU Local and a postal
> employee for more than 18 years .  On August 19, Mr. Franklin was escorted out of
> the facility by postal inspectors in full view of the employees he was elected to
> represent.  Mr. Franklin's postmaster, William Huston is known to be abusive.  In
> fact, this postmaster's wife turned to union officials to verify his irrational behavior
> in the couple's divorce proceedings." (Plaintiff's comment: 'Such behavior could
> also have reverse-devastating effect on a manager/postmaster family's future as

33

well."'")

## B. Plaintiff's Version:

**The Removal**: Plaintiff would show on or about mid-1991, defendant PTF-Perez was assigned a FTR position as an Express Mail dispatch clerk, in what was known as the "cage", with additional duties as a morning (AM) incoming/evening (PM) outgoing dispatch clerk, with his assignment area adjacent to plaintiff's work assignment area, which also included AM incoming/PM dispatch registered mail, and assignment of same to city/rural letter carriers, which was also plaintiff's duties in his area of responsibility with registered mail security.

**a)**. 3-20-92: defendant Martinez summoned defendants Figueroa and Hernandez to the Harlingen USPS: Mr. Hernandez issued plaintiff the ES, thereafter, defendant Hernandez ordered defendant Figueroa to remove plaintiff's from the USPS premises, akin to a criminal; thereafter, Mr. Figueroa, escorted plaintiff across the USPS workroom floor in full view of the APWU members he was elected to represent, without administering plaintiff his due process rights or, a reason for his removal from the building, other than as ordered by Mr. Hernandez, and at no time did Mr. Figueroa, express concern of any eminent danger from plaintiff, and went to the basement to plaintiff's locker to get a box with his personal belongings which included APWU forms, and collective bargaining reports (CBR), while defendant Figueroa occupied himself helping plaintiff carry a paper bag with some of plaintiff's other belongings, and engaged in casual conversation with plaintiff walking towards plaintiff's car parked in the USPS Jackson street leased-parking lot, about one and 1/2 blocks away from the USPS facility; thereafter, plaintiff gave Mr. Figueroa a ride in plaintiff's car back to the post office; thereafter, **b)**. on 3-23-92:

34

defendant Figueroa initiated "his write-up", of the investigative memorandum (IM). **c**).
On 3-26-92 the defendants mailed plaintiff a RDRL, and an unsuccessful delivery
attempt was made by Casual city letter carrier Robert Cantu, coerced by defendant Perez
not leave a 3849 Px-0056; thereafter, on 3-27-92: Rick Gomez FTR city letter carrier
made another unsuccessful attempt to deliver the RDRL, and he was also coerced by 204-
B James Santa Ana, and defendant Martinez not to leave 3849, and carrier Gomez was
followed by defendant Cortez on the mail route to see if plaintiff had signed for the letter
Px-0057, please see ELM 664.a ; **d**). thereafter, on 3-31-92 the MSC received plaintiff's
copy of OWCP claim, of which he had mailed simultaneously to DOL and MSC on 3-25-
92 Px-71D/Px-0055; **e**). at this point plaintiff's RDRL is confiscated from the mail
stream, and defaced, noting the letter was restricted for delivery to be (**received by
plaintiff only),** by defendant Martinez, to justify her endorsement of a fraudulent
misrepresentation of material fact, stating: "wife refused to sign" Px-71A, please see
665.2.r and 665.2.t; **f**). on 3-31-92 the RDRL disappeared and the last suspect
accountable and to have legal custody of the RDRL are defendants Martinez, Cortez or
Perez Px-007; **g**). thereafter, on 3-31-92: defendants Martinez and Cortez make a
conscious decision to fire plaintiff from his job Px-71E and Px-68S1, apparently with the
knowledge the receipt of the OWCP file at the MSC, and the apparent enlistment of
defendant Perez in the conspiracy; **h**). defendant Martinez failed to give plaintiff his
due process, in the same way that she kept denying other APWU members due pro-
cess, either by no hearing or continuously postponing any action into the ambiguous
future, witness:

> "Please be advised that your inquiry concerning refund of
> of monies related to the shortage of Ms Amanda Torres

will be dealt with in the future."

Arbitrator Caraway held: There is no evidence that the Postal Service **ever** gave the Union a definite answer as to why it refused to reimburse Ms. Torres Px-61. Similarly the implications about the **future** in our case, by the defendants', especially being that defendant Martinez, has consistently distanced herself, lied and denied to plaintiff since 1987, regarding all of the circumstances and actions and inaction against him for being the APWU local President, and now the failure to respond to many of his repeated requests for information/documentation regarding the controversial BP, and his uncontroverted RDRL claims, that remain unresolved, in the Court's file, incorporating by reference the same as if fully copied and set forth at length herein. By handwritten letter dated 2-12-91 Px-70A, from plaintiff to defendant Martinez, he complained, an instance of several, about his unaccomplished duties, with a copy mailed to Al Murch, MSC vehicle operations manager; thereafter defendant Martinez retaliated against plaintiff and responded by her letter to plaintiff dated 2-15-91 **Px-72A**, and again by her letter to plaintiff, dated 6-4-91 w/attachment Px-0073, she informed him that defendant Rocha is his immediate supervisor Px-70E, please see ELM 512.422, as a predicate letter for plaintiff's 7-day Px-11, which she refused to prosecute, (noting that on or about 12-14-91, defendant Martinez removed defendant Rocha from his SPO position because he had been ineffective in firing plaintiff, Plaintiff would show that on or about 12-14-91 defendant Martinez removed defendant Rocha from the SPO position apparently for his ineffectiveness to fire plaintiff, and replaced him with defendant Cortez as acting SPO, better qualified by defendant Martinez' standard Px-68S1, Px-71E, and retained him only for the duration of plaintiff's removal), discussed in prior briefs which are incorporated

36

by reference the same as if fully copied/set forth at length. On back pay plaintiff cites, U.S.A. v. Garrett, 99-10531 (5th Cir. 2000). In this interlocutory appeal, the government seeks review of an order of the district court, which was entered the day of trial and which excluded 25 of its witnesses in a complex, multi-defendant conspiracy case. The district court itself recognized that the exclusion of this witnesses was tantamount to a dismissal of some of the charges against the moving defendants. This case boils down to one relatively uncomplicated issue; that is, whether the district court abused its discretion by imposing the rather draconian sanction of excluding the government's witnesses from trial for discovery violations, which the court itself found not to have been made in bad faith. The case was set for trial on September 28, 1998, but was rescheduled for November 30, 1998, then for January 11, 1999, and then again for March 15, 1999 (with a February 12th deadline on discovery). On January 13, 1999, a second superseding was returned naming four additional defendants, and on March 3, 1999, a second superseding indictment was returned. Four days before the March 15th trial date, the district court held a hearing on various motions, and the following day, March 12th, it entered an order continuing the trial once again to April 5th.

Plaintiff points out that U.S. v. Garrett, 238 F.3d 293 (5th Cir. 2000), mostly concerns discovery consequences involving the Federal Rules of Crim Procedure, but would show by analogy a corresponding necessity for District Courts to show some restraint in its broad discretion under Rule 26 of the Federal Rules of Civil Procedure, whereby plaintiff would show that his case has been substantially harmed by defendants' unwillingness to respond with the Court's concurrence by its protective order, referring to Kyles v. Whitley, 115 S.Ct. 1555 (1995) (cited in Garrett, which reversed a murder conviction

because of failure by the State to produce evidence that was favorable to defendant), citing the "reasonable probability" that the omitted evidence would have altered the result, referring to a violation of "due process" under the U.S. Constitution, also claimed by us.

While a trial court has broad discretion over the discovery process, it also has discretion to compel recalcitrant defendants to provide information necessary for the promulgation of opposing party's case; S.E.C. v. College Bound, Inc., 155 F.R.D. 1 (D.Ct.D.C. 1994); Bosaw v. Nat'l Trea. Empl'ees Union, 887 F.Supp. 1199 (S.D. Ind. 1995); See Rule 26 (b)(1) of Federal Rules of Civil Procedure. Plaintiff would show that the Court's denial of his extensive/protracted discovery of the defendants herein, was an abuse of discretion; Cochran Consulting Inc. v. Uwatec USA Inc., 102 F.3d 1224 (5th Cir. 1996); Munoz v. Orr, 200 F.3d 291 (5th Cir. 2000), ssince the discretion for discovery is not limited and can result in reversal- Nguyen v. Excel Corp., 197 F.3d 200 (5th Cir. 1999).

What we have in this case, therefore, is the "suspicious" suppression of "2240's" casting a serious doubt into the defendants' veracity claims of plaintiff's full back pay, and the suppression of the RDRL, which is interrelated to his BP, which the defendants' claim it contained plaintiff's pay check/back pay check, making the contents irrelevant, what is relevant is the non-discretionary and clear violation of postal laws and regulations, and Federal Statutes by the defendants, in confiscating the letter from the mail stream, and destroying-it/concealing-it from the Postal Service records; please refer to Mail Security, described in: ASM Chapter 2, part 274.1; DMM Chapter 1, part 115.1;

Quoting part(s) of Chapter 7, Handbook F-21 (Px-83), which states in pertinent part regarding the back pay:

> 712.1 There is one preliminary activity regarding the preparation of Form 2240 that is common to **all** adjustments. This activity is easy to perform ..... ;
> 721.1 **Definition**   A "pay" adjustment is one that is necessary because of a

B.  Plaintiff restates and re-urges, and respectfully requests the Court's reconsideration of plaintiff's summary judgment (partial summary judgment in the alternative) claims; back pay/front pay; gender/sex, and age-based discrimination and retaliation claims; mail criminality; and federal tort claims; supplemental pecuniary damage claims; and reasserts and re-urges his response to the defendants' dismissal of his (1) partial summary judgment; (2) claims against the individual defendants; (3) mail criminality claims under Title 18 U.S.C. § 1709; (4) claims of emotional distress and anxiety; (5) loss of the enjoyment of life free from having to claim what is rightfully his for over a decade; (6) claims of defamation to his character; (7) claims of interference with protected property interests; and, (8) all constitutional tort claims, discussed in prior pleadings/briefs, incorporating by reference the same as if fully copied and set forth at length herein.   .

C.  Plaintiff has long-waited for his day in court, and believes he needs to send out a clear message that the tortious and egregious conduct by the defendants against plaintiff is unconscionable, unlawful and unacceptable in the workplace.

D.  Supplemental Memorandum/Brief

# I.   ADDITIONAL SUPPLEMENTAL RESPONSE AND BRIEF

## A. RETALIATION – FAVORITISM/ DISPARATE TREATMENT/DISCRIMINATION

Plaintiff restates and reurges his partial summary judgment claims; back pay/front pay; gender/sex, and age-based discrimination and retaliation claims; mail criminality;

CutePDF - www.tesoo.com

and federal tort claims; reasserts and reurges his response to the defendants' dismissal of

his (1) partial summary judgment; (2) claims against the individual defendants; (3) mail

criminal culpability under Title 18 U.S.C. § 1709; (4) claims of emotional distress and

anxiety; (5) claims of defamation to his character; (6) claims of interference with

protected property interests; (7) all constitutional tort claims; (8) supplemental amended

pecuniary/nonpecuniary relief for damages and back pay/front pay.

Plaintiff directs the attention of the Court relevant part(s) of the ELM 667.2, with

specific and pertinent parts to this case, which state(s):

## Representation of USPS Employees by the Department of Justice In Non-Motor Vehicle Cases

667.221 **Employee Responsibilities** An employee who believes he or she is entitled to representation by the Department of Justice (DOJ) in a proceeding, he or she **must promptly** submit a written request for that representation, together with all process and pleadings served, to the employee's installation head. Failure to submit a submit a request promptly may prevent the processing necessary to obtain approval of the employee's request. In order to give a request proper consideration, it must contain a detailed statement from the employee(s)of his or her knowledge of the subject matter of the proceeding and be accompanied by all pertinent documents.

667.222 **Installation Head or Higher Level Official Responsibilities**

   a. The installation head or next higher level official or other designated official should forward the request without delay to the Chief Field Counsel for the region in which the proceeding arose. (Southern Jurisdiction)

   b. The installation head …recommendation as to whether providing the employee representation would be to the best interest of United States Postal Service and a statement detailing the installation head's … knowledge of the subject matter of the case.

667.23 **Criteria for Granting Representation**

   The DOJ provides representation at its discretion and only after it determines that the employee acted within the scope of her or his authority and that such representation would be in the best interest of the United States.

Plaintiff points out to the Court that he filed Civil Action B-95-150 on September 6, 1995, allowing the Attorney General adequate advance notice, and an opportunity to investigate plaintiff's continuous allegations of the defendants' harmful misconduct; and wrongdoing against plaintiff, and the same could be said about the veracity of the defendants' allegations of misconduct against him, by showing that the Government submitted a defective representation certification of defendants Romeo Rocha, Roberto Pantoja, Gilbert G. Galvan, Arturo J. Cortez, Eddie M. Perez, Louis Bazaldua, Manuel D. Hernandez, Felix R. Figueroa and George Lopez, which was executed by defendant's counsel on 2-23-99; or approximately forty one (41) months later, when the Government had adequate advance notice of plaintiff's lawsuit.   Plaintiff would show that the Attorney General declined to certify defendant Mary Martinez, as acting within the course and scope of official capacity in her USPS employment, and her non-discretionary tortuous misconduct against plaintiff, spanning from April of 1988 to the present, discussed in prior pleadings/briefs, incorporated by reference the same as if fully copied and set forth at length herein.

Plaintiff would show that his damages are currently being revised from the prior tabulation, in part because of their continual accrual to plaintiff, and he will supplement the amount of damages, as well as category of damages, including, but not limited to credit card charges, losses on real estate property, added home equity loans, unpaid ad valorem taxes owed to taxing authorities, unpaid premiums on homeowners insurance, excessive automobile and travel expenses, added medical expenses for medical condition resulting from defendants misconduct, and other pecuiary and non-pecuniary damages.

Plaintiff renews his objection to attorney Eglesaer participating in the trial of this cause, because as an employee of USPS he is a party to the lawsuit, and also as custodian/supervisor of records, he is a witness.

WHEREFORE, PREMISES CONSIDERED, FRANCISCO R. RODRIGUEZ plaintiff prays that the Magistrate Judge reverse his decision and overrule the Postal Service motions to dismiss awarding plaintiff his partial summary judgment, back pay, front pay, higher level-6 pay, OT pay, and supplemental amended pecuniary relief in addition to further proceedings on his other causes of action/remedies for discrimination, commensurate with this brief after granting leave of the Court, as well as plaintiff's continuing request for joinder/interpleader of A.P.W.U. as a real party in interest, and grant any other and further relief to which plaintiff may be justly entitled.

Dated:  7/30/01.

Respectfully submitted

*David E. Fast*

DAVID E. FAST, *By JKR*
TBA #068450500, S.D. Adm. #2129
11217 Leopard Street, "G"
Corpus Christi, TX  78410
Attorney for Plaintiff
(361) 241-4495

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above supplement to Plaintiff's third amendment and added responses/brief to Defendants was delivered to opposing party's attorney of record, by FAX, hand delivery or by certified mail – return receipt requested, by depositing in a mail depository of the U.S. Postal Service in a wrapper properly addressed, postage prepaid, to the said attorney on *30* day of July, 2001.

*David E. Fast by JKR*

DAVID E. FAST

42

## CERTIFICATE OF CONSULTATION

This is to certify that on ____ day of July, 2001, I attempted to telephone opposing counsel, without any resolution of the matters raised in Plaintiff's added responses/brief to his supplement to third amendment on Defendants motions to dismiss.

_David E. Fast, By Fax —_
_Permission_

DAVID E. FAST

Case 1:95-cv-00150   Document 123   Filed in TXSD on 08/02/2001   Page 27 of 51

## Notification Procedure

Inquiries must be addressed to the head of the facility where application was made. Inquiries must contain full name, position applied for, the date the Promotion Board met, and Social Security number.

## Record Access Procedures

Requests for access must be made in accordance with the notification procedure above and the Postal Service Privacy Act regulations regarding access to records and verification of identity under 39 CFR 266.6.

## Contesting Record Procedures

See Notification and Record Access Procedures above.

## Record Source Categories

Employee and employee personnel data.

# USPS 030.030

## System Name

Equal Employment Opportunity — EEO Administrative Litigation Case Files, 030.030.

## System Location

Law Department, Postal Service Headquarters, and field offices; area offices and districts.

## Categories of Individuals Covered by the System

Employees and applicants for employment involved in EEO litigation.

## Categories of Records in the System

a.  Formal pleadings and memoranda of law.

b.  Other relevant documents may contain names, work locations, dates, Social Security numbers, and other information included on affidavits, interviews, investigative forms, counselor reports, exhibits, discovery, withdrawal notices, briefs, appeals, copies of decisions, records of hearings and meetings, and other records related to complaints.

c.  Miscellaneous notes and case analyses prepared by Postal Service advocates and other personnel.

d.  Correspondence and telephone records.

## Authority for Maintenance of the System

39 U.S.C. 401, 409(d).

Case 1:95-cv-00150   Document 123   Filed in TXSD on 08/02/2001   Page 28 of 51

435 **Back Pay**

> **Reference Note:**
> For additional material concerning the subject matter found in 436,
> refer to:
>
> ■   Management Instruction EL-430-90-8 or its replacement.

## 436.1 Corrective Entitlement

436.11   An employee or former employee is entitled to receive back pay for the period during which an unjustified or unwarranted personnel action was in effect which terminated or reduced the basic compensation, allowances, differentials, and employment benefits which the employee normally would have earned during the period.

436.12   For purposes of entitlement to employment benefits, the employee is considered as having rendered service for the period during which the unjustified or unwarranted personnel action was in effect.

## 436.2 Limitations

436.21   Any amount which the employee earned in a new employment or in an enlarged part-time employment to replace Postal Service employment must be determined and offset against the amount of the reimbursement to which she or he would be entitled.

436.22   Back pay is allowed, unless otherwise specified in the appropriate award or decision, provided the employee has made reasonable efforts to obtain other employment, except that the employee is not required to make such efforts during the first 45 days of the back pay period. This 45-day period does not apply to individuals who were denied employment with the Postal Service (see 436.428).

436.23   No back pay is allowed for any period during which the person was not ready, willing, and able to perform the duties of the postal position.

436.24   Leave which is recredited as a result of the corrective action may not exceed the maximum amount of leave to which the employee was eligible.

436.25   The employee is not entitled (a) to increases in pay resulting from deferment of step increases due to unsatisfactory service or (b) to salary increases resulting from ranking action.

436.26   Any claim made by a postal employee or his or her authorized agent or attorney for back pay must be submitted to the appropriate office within 6 full years after date such claim first accrued.

## 436.3 Corrective Action

The installation head, or other appropriate authority, determining that a previous decision was unjustified or unwarranted, initiates and directs the corrective action to be taken to assure appropriate earnings to the employee for the period affected.

Case 1:95-cv-00150   Document 123   Filed in TXSD on 08/02/2001   Page 29 of 51

435.4    Documents in Support of Claim

436.41   **Statements by Local Official**

436.411  The local official must provide a tabulation of the number and type of pay hours with which the employee should have been credited during the back pay period, including any annual or holiday leave taken.

   a.    Overtime hours and/or night differential, as applicable, are determined by averaging the number of hours that other employees of the office with the same employment status were assigned during the back pay period.

   b.    If the claim is for a part time flexible employee, a tabulation must be provided which shows the number and type of pay hours the employee experienced for a full 13 pay periods prior to the separation or suspension. If the back pay period is less than one full pay period, only a 6 pay period tabulation is required.

436.412  The local official must provide a statement indicating whether the employee is entitled to the following during the back pay period:

   a.    Premium pay (see 434).

   b.    Change in pay rate or salary schedule.

   c.    Step increase and date effective.

   d     Change in leave category and date effective.

   e     Other changes in pay of a general application.

436.413  The local official must provide a statement indicating that had the employee not been suspended or removed she or he would have worked the hours as reported.

436.414  The local official must provide a statement showing that monies earned by the employee for other employment during the period covered by the corrected action shall be deducted, provided such earnings were from work which replaced the lost postal employment (see 436.21).

436.42   **Statements by Employee**

436.421  A statement signed by the employee agreeing or disagreeing to the hours shown in 436.412. If the employee does not agree, the basis for the disagreement should be explained.

436.422  Where the original action resulted in separation or suspension, the employee must furnish the following:

   a.    A statement on whether or not any income was earned during the back pay period. If any outside earnings were received, provide information on whether the earnings were from a part-time job held at the time of removal, in a new employment, or in an enlarged part-time employment obtained to replace the postal employment. In either case, a statement from the employer showing the record of hours worked and gross earnings during the back pay period is necessary.

   b.    If the employee was already working in a part-time job at the time of removal or suspension, the employer should include the employee's

CDIxPDF www.foxio.com

## PLAINTIFF'S APPENDIX "A" BRIEF EXHIBIT

**PLAINTIFF'S** Brief Life History:  Plaintiff, FRANCISCO R. RODRIGUEZ, in Cause

No. B-95-150, would describe a portion of his life's history very significant in this case,

as he would discuss: (1) In 1956 he married his present wife, Emma, and together gave

birth to four sons; Manuel, Frank, Jr., Samuel and Robert; and three daughters Cynthia,

Elizabeth and Patricia.  (2) On or about the early 1960's, plaintiff purchased some

property, situated on the corner of So. "J" ("J") and Johnson ("Johnson") streets, from his

cousin Jose Maria (JM) Rodriguez on payments, consisting of two lots; the lot on "J" had

the house, which plaintiff moved into with his then small family, the lot on Johnson was

vacant, and thereafter, JM moved to California.  Plaintiff, was planning for the protection

and welfare of his family, on or about 1960 he bought a small Kof C $2,500.00 30-year

plan life insurance policy; In 1966, plaintiff was employed by the defendant USPS;

plaintiff, with his now secured job with the defendant USPS, he was looking towards the

future, and in 1968, he started an auto parts business,   located at 323 W. Harrison St,

(Harrison) in Harlingen paying rent, and managing it concurrently with his secured job at

the USPS; plaintiff was still looking further to the future for his family's security and

welfare, and perhaps the future enjoyment of a comfortable retirement, with his real

estate investments; and on or about the 1970's he purchased a house-to-be-moved and

financed it through then Plaza National Bank, and moved it to the vacant lot on

"Johnson"; later on or about the early 1970's he secured a loan through the then First

National Bank and purchased the property on Harrison, an Original Town Site historical

property; on or about 1986 due to the revolutionized auto parts industry and the adverse

economic conditions, and with an enormous remodeling indebtedness on the Harrison

1

property financed through HNB, he sold the auto parts business and rented the building; on or about 1990, plaintiff, still looking out for his family's security and welfare, he purchased a K of C life insurance policy, and paid $77.00 per PP, through his secured USPS job, through payroll direct deposit deduction allot; plaintiff had several thousands of dollars of CU loans being paid by $538.00 PP allot (during 1992 and prior the CU had the offices in the basement, directly below the workroom floor of the defendant-USPS); and with the enormous HNB indebtedness left outstanding from his auto parts/building venture, loan payments were being made with earnings from his USPS-secured job, for the indebtedness resulting from the auto parts/building remodeling venture. Plaintiff would show that his secured job with the defendant-USPS was no longer there, and in May of 1992, with the burden of being unable to meet the insurance premiums, taxes, and HNB note payments, and maintenance on Harrison, J St, and Johnson properties, on or about May of 1992, plaintiff was forced to sell the Harrison property at a loss, on a second lien contract Px-95C, rather than foreclosure. Thereafter, on or about July of 1994, he sold the Johnson and J properties on a second lien contract. Plaintiff would show that the loss of his secured job with the defendant-USPS, created tremendous problems for him with health complications, anxiety, frustration, and mental anguish; concerns for his family, and for his siblings and their families, the monthly payment collections on the properties were consistently slow or several payments in arrears, but plaintiff had to make first lien payments at the HNB, finally on or about July of 1997, he was forced into a foreclosure with the Johnson and J properties; his monthly payment collection on the Harrison property continued to be problematic, which contract was due in the year 2000, but finally was paid-off on or about March of 2001. This predicament

2

he was put into by the defendants was an embarrassment to him, his family, friends; and for his co-workers because he had let them down as their APWUI Local President for many, many years, and to the community-at-large, including prominent businesspersons, because he too was a well respected business person in the community.  Plaintiff would show that being confronted with such a predicament, and in effort to avoid foreclosure(s) on his home and real estate properties. he saw financial help was imminent, and he would point to examples of pre-termination financial support, by showing that his family continued with their support, more so now, because they know that their dad was in a very serious financial crisis; he would also go to his friends, and other relatives, for their financial help, which they all continue to do, both financially and morally as well. Plaintiff would show that the real estate investment he had created for a comfortable retirement, was eventually lost, "Johnson" and "J" in 1997, and "Harrison" in March of 2001.  Plaintiff would show that the intolerable working environment he was subjected to work under, was the direct and proximate cause of the irreversibly impaired health he has suffered and endured, having had job-related heart complications; with a heart attack in November of 1991, a recurrence of same in March of 1994, and again in March of 2001; and is being deprived of a decade of the enjoyment of quality retirement life. the enjoyment of being with his grandchildren; just because a lady hated him, of which by definition is a crime, and a crime creating damages of such magnitude, as the ones displayed in this case; is a hate-crime, of which such an egregious conduct, merits scrutiny and judicial review.

3

## SOME OF THE MANY EXAMPLES OF FINANCIAL SUPPORT

A.  Siblings and Relatives      [Francisco R. Rodriguez (FRR) plaintiff]

| | | |
|---|---|---:|
| 9-11-89: Rodriguez, Manuel, son: - check to FRR | | $  300.00 |
| 6-28-90: Manuel – son: CU loan dated 6-28-90 – proceeds to FRR | | 3,000.00 |
| 7-11-91 Manuel – son: check of unspecified amount  – to FRR | | |
| 4-30-92 Manuel – son: check #1676, to FRR | | 700.00 |
| Manuel: total estimated financial assistance to FRR, un-reimbursed  +/- | | $ 8,000.00 |

1990 on/off to present: Carr, Cynthia, daughter: estimated total
financial assistance to FRR, un-reimbursed.                                    +/-  $ 4,000.00

1990 to on/off 1993: Catlin, Elizabeth, daughter: estimated total
financial assistance, un-reimbursed.                                           +/-  $ 3,000.00

6-24-88 Sam, son – "a little something to help you out", a check of
unspecified amount, to FRR, un-reimbursed.

| | | |
|---|---|---:|
| 9-11-89 Sam | a check to FRR | 200.00 |
| 7-16-92 Sam | a check to FRR | 200.00 |
| 8-13-92 Sam | a money order to FRR | 200.00 |
| 4-29-93 Sam | a direct deposit to FRR's checking account | 1,000.00 |
| Sam: estimated total financial assistance to FRR, un-reimbursed   +/ | | $3,000.00 |

| | | |
|---|---|---:|
| 9-11-89 - Francisco Jr. (Frank), son: | a check to FRR | 100.00 . |
| 6-21-92 – M/M Frank Jr.: | a check to FRR | 200.00 |
| Nov./Dec. '92 Frank Jr.: | cash to FRR | 250.00 |
| 2-6-93  Plaintiff reimbursed Jr. [w/money order (M.O.)] | | 250.00 |
| Frank Jr.: estimated total financial assistance to FRR, un-reimbursed, (M.O. not include M.O.)  +/- | | $ 800.00 |

1990 on/off to +/- 1998, through the years: Saldana, Maria,
sister-in-law: estimated financial assistance to FRR, un-reimbursed +/- $ 2,500.00

1992 on/off to +/- 1998, through the years: Longoria, Aurora, sister,
estimated financial assistance to FRR, reimbursed                     +/- $ 2,000.00

B.  Friends and Coworkers

1992 on/off to +/- 1998, through the years: Stillman, Robert, friend,
estimated financial assistance to FRR, reimbursed                     +/- $ 3,000.00

1992 on/off  to +/- 1998, through the years: Castaneda, Mary,
coworker, estimated financial assistance to FRR, reimbursed           +/- $ 3,000.00

7-3-92: Castaneda, Abel, coworker, one of many loan-checks,

4

of financial assistance for FRR, check #6330, reimbursed  Px-0039     $   500.00

4-30-93: Abel Castaneda: co-signed Firstbank note for FRR     $ 2,871.00

1992 on/off to +/- 1998, through the years: Castaneda, Abel,
coworker, estimated total financial assistance to FRR, reimbursed    +/-  $3,000.00

Total Financial and Assistance/Support in FRR's Hardship     $  32,671.00

# Harlingen National Bank

HARLINGEN, TEXAS 78550

Deposit May Not Be Available For Immediate Withdrawal

YOUR ACCOUNT NUMBER  044·0574

DATE  9-11-89  19___

FRANK R. RODRIGUEZ  on

719 CITRUS TERRACE

HARLINGEN, TX 78550

| | DOLLARS | CENTS |
|---|---|---|
| MANUEL | 300 | 00 |
| SAM | 200 | 00 |
| FRANK | 100 | 00 |

| | DOLLARS | CENTS |
|---|---|---|
| CURRENCY | | |
| COIN | | |
| PESOS | | |
| TOTAL OF ALL CHECKS LISTED | | |
| TOTAL DEPOSIT | 600 | 00 |

ADDITIONAL SPACE TO LIST CHECKS ON BACK AND BRING TOTAL FORWARD

ORIGINAL

⑈11492217⑈  ⑈044 0574⑈  40  ⑈0000060000⑈

---

# Harlingen National Bank

HARLINGEN, TEXAS 78550

Deposit May Not Be Available For Immediate Withdrawal

YOUR ACCOUNT NUMBER  044·0574

68-2217

DATE  6·21  19 92

FRANK R. RODRIGUEZ

719 CITRUS TERRACE

HARLINGEN

| | DOLLARS | CENTS |
|---|---|---|
| FRANK MARY RODRIGUEZ | 200 | 00 |
| LESS CASH | 10 | 00 |

| | DOLLARS | CENTS |
|---|---|---|
| CURRENCY | | |
| COIN | | |
| PESOS | | |
| TOTAL OF ALL CHECKS LISTED | | |
| TOTAL DEPOSIT | 190 | 00 |

ADDITIONAL SPACE TO LIST CHECKS ON BACK AND BRING TOTAL FOWARD

ORIGINAL

DEPOSIT AGREEMENT ON REVERSE

⑈11492217⑈  ⑈044 0574⑈  40  ⑈0000019000⑈

**VALLEY POSTAL CREDIT UNION**
P.O. BOX 1525 - 221 E. VAN BUREN
HARLINGEN, TEXAS 78550-1525

RODRIGUEZ MANUEL M                          ACCOUNT NR:        13931
                                            TELLER: 001/DIANNA
CHECK NR ISSUED:        DATE                DATE:    8 25/91
                                            TIME:    3:48 PM

TYPE   DESCRIPTION      TRAN AMOUNT   NEW BALANCE      PRINCIPAL      INTEREST

31   LOAN ADDON CHECK    2,000.00     2,000.00       2,000.00

                                                    RECEIVED BY

_M.M.R_
_P.O. Box 508_
_T or C, NM 87901_







_Francisco R. Rodriguez_
_719 Citrus Terrace_
_Harlingen, Texas 78550_

M. N. Rodriguez
P.O. Box 508
T or C, NM 87901




Francisco R. Rodriguez
719 Citrus Terrace
Harlingen Texas 78550



MANUEL RODRIGUEZ
P. O. BOX 508
TRUTH OR CONSEQUENCES, NM 87901

1676

04 30 19 92                95-7039/3122

Pay to the order of   Francisco R. Rodriguez        $ 700.00

Seven Hundred Dollars NO/100                            Dollars

Home Federal
Savings Bank
915 Date St.
Truth or Consequences, New Mexico 87901

Preferred Checking Plus

For _____

⑆3122703951⑆ 003 002172 8⑈ 1676

Rocky Mountain Bank Note ®

Harlingen
National
Bank
HARLINGEN, TEXAS 78550

CREDITED NEXT BUSINESS DAY
MAY - 5 1992
Deposit May Not Be Available For Immediate Withdrawal

YOUR ACCOUNT NUMBER
044 · 0574

DATE      5-4      19 92

FRANK R. RODRIGUEZ
719 CITRUS TERRACE
HARLINGEN, TX 78550

⑆1149221719⑆

TELLER #00   MANUEL RODRIGUEZ   700 00

| | DOLLARS | CENTS |
|---|---|---|
| CURRENCY | | |
| COIN | | |
| PESOS | | |
| TOTAL OF ALL CHECKS LISTED | | |
| TOTAL DEPOSIT $700.00 | 700 | 00 |

ADDITIONAL SPACE TO LIST CHECKS ON BACK AND BRING TOTAL FOWARD

044 0574⑈ 40 ⑆000007000 0⑆

m Rodriguez
cS Memphis
Ennis, Tx 75119



Frank Rodriguez
719 Citrus Terrace
Harlingen, Tx 78550

6-24-88

Hi Mom & Dad,

HERE'S A little SOMETHING TO HELP you
out. IF you NEED A little MORE let ME KNOW.
PAY WHEN you CAN I'm IN NO HURRY.
SEE you SOON!

Love
Sam & Val

CMPDF - www.fesisu.com

Sam Rodriquez
Rt. 1 Box 3295
Atka, OK 74525

Frank Rodriquez
719 Citrus Terrace
Harlingen, TX 78550

Hi Mom + Dad,

We are so excited about the great news. It seems like when something of this magnitude happens time seems to drag on. But at least it's pretty much over. We are looking forward to seeing everyone at Houston Jul. 22-24. Tell Mitzi + Cindi we said hello. We love you and be careful. I hope this check helps.

Love Sammy, Valerie
+ Jonathan

H Harlingen National Bank

HARLINGEN, TEXAS 78551

YOUR ACCOUNT NUMBER

044·05

PAID

Deposit May Not Be Available For Immediate Withdrawal

DATE JUL 16 1992

FRANK R. RODRIGUEZ
719 CITRUS TERRACE
HARLINGEN, TX 78550

| | DOLLARS | CENTS |
|---|---|---|
| Sammy Rodriguez | 200 | 00 |
| Less Cash | 5 | 00 |
| | DOLLARS | CENTS |
| CURRENCY | | |
| COIN | | |
| PESOS | | |
| TOTAL OF ALL CHECKS LISTED | | |
| TOTAL DEPOSIT | 195 | 00 |

ADDITIONAL SPACE TO LIST CHECKS ON BACK AND BRING TOTAL FOWARD

ORIGINAL

71692#061     $195.00 D     044·0574#

⑆114922171⑆          044 0574⑈ 40 ⑆000001950 0⑈

J. Rodriguez
RT.Z Box 3295
Atoka, OK 74525

AUG
10

200² Money Order
8 / 13 / 92

Frank. Rodriguez
719 Citrus Terrace
Harlingen, TX 78550



**FRANK R. RODRIGUEZ**
719 CITRUS TERRACE   PH 423-8632
HARLINGEN, TEXAS 78550

| CURRENCY | | |
|---|---|---|
| COIN | | |
| CHECKS | $427 | |
| | M.O. | 200 00 |
| TOTAL FROM OTHER SIDE | | |
| SUB-TOTAL | | 200 00 |
| LESS CASH RECEIVED | | |
| | | 200 00 |

56-2217/1149

**DEPOSIT TICKET**
PLEASE ITEMIZE ADDITIONAL CHECKS ON REVERSE SIDE

Harlingen National Bank

$200.00

⑈1149221?1⑈   ⑈044 0574⑈   40   ⑈00000 20000⑈

---

mode     status     moc     error-intercpt
**DEMAND DEPOSIT**     PROD     Credit     FT INCOMING MSG
rcvr     typ     asof-dt     rsn ref-input-rev     struct code
**The Harlingen National Bank**     22171 1000     amt     Account # 0440574
111000614 930429000451017D 1,000.00

BK ONE TX DALLAS   /ORG=GFA/EOD COUNTY TEACHER FED CR UN OGB=BANK ONE TEXAS

HARLINGEN NATL   /CTR/BNF=FRANK RODRIGUEZ A/C 0440574 BBI=SEQ-930429000451

**PAID**
APR 29 93
HARLINGEN NATIONAL BANK
HARLINGEN, TEXAS
1149-2217-1

imad     omad
0429 K1QJC01C 000170 04291114 FT1P   0429 140NY10C 000003 04291114 FT1P

3

⑈1149221?1⑈     044 0574⑈   40   ⑈0000 100000⑈

**CUSTOMER'S RECEIPT** DO NOT SEND THIS RECEIPT FOR PAYMENT KEEP IT FOR YOUR RECORDS

47166739908   930206   785502   *250*00

SERIAL NUMBER

PAY TO: FRANK RODRIGUEZ JR.

ADDRESS: 1018 C.v.   MESQUITE, TX 75150

PAID $250.00

U.S. DOLLARS AND CENTS

FRANK RODRIGUEZ, JR.
719 CITRUS TERRACE
HARLINGEN, TX 78550



Abel or Mary Castaneda  12-82
Lu Fin 01011710  Lu Kem 06179969
Svr1 Lazy Lake Dov Ph. 423-1560
Harlingen Tx  78500-5636

6330

7-3  92

94-2128/1149

Pay to
the order of   Frank Rodrigue    $ 500.00

five hundred dollars   NO
100

FIRST BANK
HARLINGEN
(512) 428-5832
1901 SOUTH 77 SUNSHINE STRIP
HARLINGEN, TEXAS  78550

for Loan for Frank        Abel Castal

⑈1149212821⑈ 6330⑈ 031002457⑈

CURRENT INC. COLORADO SPRINGS, CO 80941 · PUEBLO STK. BOX · JACQUELINE ROCHESTER

---

Harlingen
National
Bank

PAID

HARLINGEN, TEXAS

YOUR ACCOUNT NUMBER

0 4 4 · 0 5 7 4   2

Deposit May Not Be Available For Immediate Withdrawal

HARLINGEN NATIONAL BANK

1149-2217-1    1143-2217-1

DATE

FRANK R. RODRIGUEZ

719 CITRUS TERRACE

HARLINGEN TEXAS 78550    $500.00 0

⑈1149221211⑈  044. 0574⑈ 40 5⑈000050000⑈

PAID

| | DOLLARS | CENTS |
|---|---|---|
| ABEL CASTANEDA | 500 | 0 |
| | | |
| CURRENCY | | |
| COIN | | |
| PESOS | | |
| TOTAL OF ALL CHECKS LISTED | | |
| TOTAL DEPOSIT | 500 | 00 |

ADDITIONAL SPACE TO LIST CHECKS ON BACK AND BRING TOTAL FOWARD

ORIGINAL

DEPOSIT AGREEMENT ON REVERSE

CUMPDF - www.texio.com

This Property will be used for ___Personal___ purposes.

| ANNUAL PERCENTAGE RATE<br>The cost of my credit<br>as a yearly rate. | FINANCE CHARGE<br>The dollar amount the<br>credit will cost me | AMOUNT FINANCED<br>The amount of credit<br>provided to me or on my behalf | TOTAL OF PAYMENTS<br>The amount I will have paid when<br>I have made all scheduled payments | I have the right to receive at this time an itemization of the Amount Financed. |
|---|---|---|---|---|
| 17.954 % | $ 370.28 | $ 2500.00 | $ 2870.28 | ☑ YES - I want an itemization<br>☐ NO - I do not want an itemization |

My Payment Schedule will be:

| Number of Payments | Amount of Payments | When Payments Are Due | | |
|---|---|---|---|---|
| 18 | $ 159.46 | Monthly Beginning MAY 30, 1993 | | "e" means an estimate |
| | $ | | | $ _____ Filing Fees |
| | $ | | | $ _____ Nonfiling Insurance |

Security - I am giving a security interest in:
☐ the goods or property being purchased
☑ collateral securing other loans with you may also secure this loan.
☑ My deposit accounts and other rights to the payment of money from you.
☑ brief description of other property)   UNSECURED

Late Charge - ☑ If all or any part of a payment is more than 10 days late, I will be charged 5% of the amount of the payment.
☐ interest will accrue at the rate of _____ % per year on the amount of any installment not paid in full when due

Prepayment - If I pay off this note early, I ☑ may ☐ will not be entitled to a refund of part of the finance charge.

I can see my contract documents for any additional information about nonpayment, default, any required repayment before the scheduled date, and prepayment refunds and penalties.

**CREDIT INSURANCE** - Credit life insurance and credit disability insurance are not required to obtain credit, and will not be provided unless I sign and agree to pay the additional costs.

| Type | Premium | Term |
|---|---|---|
| Credit Life | | |
| Credit Disability | | |
| Joint Credit Life | | |

I ☐ do ☑ do not want credit life insurance.
I ☐ do ☑ do not want credit disability insurance.
I ☐ do ☑ do not want joint credit life insurance.
I ☐ do ☑ do not want _____ insurance.

X _____ DOB _____
X _____ DOB _____

**PROPERTY INSURANCE** ☐ IS REQUIRED. ☑ IS NOT REQUIRED. I may obtain property insurance from anyone I want that is acceptable to you. If I get the insurance from or through you I will pay $ _____ for _____

I have the option of furnishing any insurance you require in connection with this transaction either through existing policies I own or control or through procuring and furnishing insurance coverage equivalent to that you require through any insurance company authorized to do business in _____

☐ The premium quoted above for _____ insurance is not _____ State Board of Insurance.

**ITEMIZATION OF AMOUNT FINANCED**

| | | |
|---|---|---|
| AMOUNT GIVEN TO ME DIRECTLY | $ | 2500.00 |
| AMOUNT PAID ON MY (LOAN) ACCOUNT | $ | N/A |
| AMOUNTS PAID TO OTHERS ON MY BEHALF: | | |
| to Insurance Companies | $ | N/A |
| to Public Officials | $ | N/A |
| | $ | N/A |
| | $ | N/A |
| (less) PREPAID FINANCE CHARGE(S) | $ | N/A |
| Amount Financed | $ | 2500.00 |

(Add all items financed and subtract prepaid finance charges.)

**SIGNATURES - I AGREE TO THE TERMS SET OUT ON PAGE 1 AND PAGE 2 OF THIS AGREEMENT. I HAVE RECEIVED A COPY OF THIS DOCUMENT ON TODAY'S DATE.**
COSIGNERS - SEE NOTICE ON PAGE 2 BEFORE SIGNING.

Signature _Francisco R. Rodriguez_ X
FRANCISCO R RODRIGUEZ

Signature _____
ABEL R CASTANEDA JR

Signed _Abel R Castaneda Jr_   (Optional)
Title _____   For Lender

PRECOMPUTED INTEREST NOTE, DISCLOSURE, AND SECURITY AGREEMENT
© 1981, 1988 BANKERS SYSTEMS, INC., ST. CLOUD, MN 1-800-397-2341) FORM CIN-PI-TX 5/31/91

CONSUMER LOAN - NOT FOR OPEN-END CREDIT
(page 1 of 2)

PAID
NOV 4 1994
FIRST BANK
CAMERON CO. TEXAS

FIRSTBANK
1901 S  77 SUNSHINE STR1
HARLINGEN TX  78550

**LENDER'S NAME AND ADDRESS**
"You" means the Lender, its successors and assigns.

FRANCISCO R _____
ABEL R CASTILLO _____
719 CITRUS _____
HARLINGEN TX  78550

**BORROWER'S NAME AND ADDRESS**
"I" includes each Borrower above, jointly and severally.

| | |
|---|---|
| Loan Number | 388650___ |
| Date | 4/30/93 |
| Maturity Date | 10/30/94 |
| Loan Amount $ | 2870 |
| Renewal Of | |

TERMS FOLLOWING A  ☒ APPLY ONLY IF CHECKED

NOTE - For value received, I promise to pay to you, or your order, at your address above, the sum of

TWO THOUSAND EIGHT HUNDRED SEVENTY AND 28/100 _____ Dollars $   2870.28

PAYMENT - I will pay this note as follows:

(a) ☒ In   18   installments of $    159.46   each, beginning   5/30/93   and continuing on the same day of each ☐ month thereafter until paid in full.

(b) ☐ (other) _____

**PAYMENTS** - This is a precomputed note which means that the sum I have agreed to pay already includes the finance charges payable hereafter to maturity.

**PREPAYMENT AND ACCELERATION REFUND** - I may prepay this note at any time. If I prepay this note in full, by cash, renewal, new loan or otherwise, I will be entitled to a refund or credit on the precomputed interest. The method you will use to calculate the refund will depend upon how this note is originally scheduled to be repaid (as provided in the Texas Consumer Credit Code). However, I will not be entitled to any refund if the amount calculated is less than $1.00. The two different methods of calculating this refund are described on page 2 of this form.

If you accelerate and demand payment in full of the unpaid balance of this note, the precomputed interest included in the note total must be recalculated by the same method you would use if I prepaid this note in full on the date of demand, to determine the amount due. Partial prepayment will not excuse any later scheduled payments until I pay in full.

**SECURITY** - You have certain rights that may affect my property, as explained on page 2. This loan ☒ is ☐ is not otherwise secured.

☐ This loan _____

☐ ☒ Security Agreement. I give you a security interest in the Property described below. The rights I am giving you in the Property and the obligations this agreement secures are _____ this agreement.

☐ **LATE PAYMENTS** - If this note is payable in substantially equal, successive monthly installments, I agree to pay additional interest of 5% of the amount of a scheduled payment if all or any part of the payment is not paid within 10 days after it is due.

If this note is payable other than in substantially equal, successive, monthly installments, I agree to pay interest on any payment not made when due at the rate of _____

**POST-MATURITY INTEREST** - Interest will accrue at the rate of    18   % per year on the balance of this note not paid at maturity, including maturity by acceleration, _____

THE PURPOSE OF THIS LOAN IS -   CAR REPAIRS

This Property will be used for   Personal   purposes

## RODRIGUEZ v. USPS, ET AL
## CAUSE NO. B-95-150

## I. PLAINTIFF'S ANNUAL HOUSEHOLD NORMAL/ORDINARY AND EXPENSES

**A.** UTILITIES

|   |   |   |   |
|---|---|---|---|
| 1. Electricity | $ | 2,448.00 | |
| 2. Water | | 840.00 | |
| 3. Telephone | | 966.00 | |
| 4. Home Equity Mortgage | | 5,730,00 | $   9,984.00 |

**B.** MEDICATION – NECESSARY (Necessay)

|   |   |   |
|---|---|---|
| 1. Plaintiff | 360.00 | |
| 2. Plaintiff, Spouse (EMMA) | 743.00 | 1,103.00 |

**C.** HOMESTEAD TAXES, AND INSURANCE

|   |   |   |
|---|---|---|
| 1. City & School | 737.00 | |
| 2. County | 187.00 | |
| 3. Homeowners | 937.00 | 1,861.00 |

**D.** AUTOMOBILE -- ANNUAL MAINTENNACE

|   |   |   |
|---|---|---|
| 1. Vehicle Registration | 53.00 | |
| 2. State Inspection | 13.00 | |
| 3. Liability Insurance | 498.00 | |
| 4. Scheduled Maintenance | 108.00 | 672.00 |

**E.** K of C LIFE INS., Premium Per Annum
   F.R. & Emma Rodriguez

|   |   |   |
|---|---|---|
| 1. Policy #010334070 [Automatic Loan (AL)] | | |
| 2. Policy #0100C77519   PL/AL | | |
| 3. Policy #0101971909 | 332.00 | 332.00 |

**F** SECURITY 1st. FED. CR. UN. (annual pmts.)

|   |   |   |
|---|---|---|
| Acc't #806830-loan #21SIG | 845.00 | |
| - loan #23 SHR | 1,200.00 | 2,045.00 |

**G.**

|   |   |   |   |
|---|---|---|---|
| Wards/Walmart | Min. Alt Pmt | 51.00 | 612.00 | |
| Providian VISA | "   "   " | 51.00 | 612.00 | |
| Citibank M/card | (Alt Pmt) | | 612.00 | |
| Sam's Club | "   " | 75.00 | 900.00 | |
| Bank One VISA | (Alt Pmt) | | 900.00 | |
| Discover | (Alt Pmt) | | 900.00 | 4,536.00 |

Totals  **A to G**          $  22,454.00

1

**H**.  PLAINTIFF'S ANNUAL INCOME
    1.  Annuity         $  16,800.00
    2.  SS Benefits       6,870.00
Totals  H. 1., H. 2       $  23,670.00           $  23,670.00
Less totals A to G above – excludes livelihood,       - 22,454.00
clothing, auto repairs & operational expenses,
and, extra-ordinary medical expense, legal
expenses, etc., with a meager balance of        $  1,216.00
                                                         ========

## II  LIABILITIES

### A.  LIENS/LOANS/NOTES HOLDING AT REMOVAL FROM EMPLOYMENT, WHICH ACTIONS COMMENCED WITH 12-11-91 7-DAY SUSPENSION

| | | | |
|---|---|---|---|
| 1. CREDIT UNION | $ Amount | $ | $ |
| a). Ln #806831-21   (1-1-92) | 1,542.00 | | |
| b). Ln #806830-21   (1-1-92) | 4,146.00 | | |
| c). Ln #806830-22   (1-1-92) | 4,741.00 | | |
| d). Ln #806830-23   (1-1-92) | 9,467.00 | 19,896.00 | |
| e). Noting the late pmt. charge | | | |
| f). Ln #806830-21(8/25/92 Px-004 | 4,365.00 | | |
| g). Ln #806830-00 (8-8-95) | 11,539.00 | | |
| h).Ln #806830-22SHR (10-3-98) | 11,011.00 | | |
| i).Ln #806830-21SIG  (7-20-00) | 1,000.00 | | |
| j). Ln #806830-21SIG  (6-01-01) | 1,868.00 | 29,783.00 | |
| Total | | 49,679.00 | $  49,679.00 |
| | | | ========= |
| 2. HNB Ln # 502-4691-60 w/balloon $ 52,667.00 | | | |
| a). (1) 1-1-92 Orig. Note w/balloon | 45,680.00 | 10,290.00 | |
| b)  (1a)         refinance fees | | | |
| c). (2) 4-20-93 Renewed Balloon | 45,680.00 | | |
| d). (3) 5-12-93 Orig. Lien Release | - 7,597.00 | | |
| plus $13.00 filing fee | 38,083.00 | 38,083.00 | |
| Total | | 48,373.00 | $  48,383.00 |
| | | | ========= |
| 3. BAILEY MORTGAGE CO. | | | |
| a). Loan #0009433379 | | 5,818.00 | $  5,818.00 |
| | | | ========= |
| 4. COUNTY, CITY AND SCHOOL | | | |
| County Taxes | $ | $ | |
| a). 1992 | 183.80 | | |
| b). 1993 | 217.22 | | |
| c). 1994 | 160.58 | | |
| d). 1995 | 183.46 | | |

2

|  |  |  |  |
|---|---|---|---|
| e). 1996 | 206.92 | | |
| f). 1997 | 199.71 | | |
| g) 1998 | 126.31. | | |
| h). 1999 | 123.31 | | |
| i). 2000 | 185.12 | | |
| Total | 1,586.43 | 1,586.00 | |

City And School Taxes

|  |  |  |  |
|---|---|---|---|
| a). 1992 | ? | | |
| b). 1993 | 744.66 | | |
| c). 1994 | 760.50 | | |
| d). 1995 | 975.00 | | |
| e). 1996 | 888.56 | | |
| f). 1997 | 925.87 | | |
| g). 1998 | 767.59 | | |
| h). 1999 | 655.71 | | |
| i). 2000 | 650.04 | | |
| Total | 6,367.83 | 6,368.00 | |
| Total County, City & School | | $ 7,954.00 | $ 7,954.00 |
| | | ============ | ============ |
| 5. Homeowners Ins. 1993 to 2002 | | $ 8,097.00 | $ 8,097.00 |
| | | | ============ |

Total Indebtedness Holding at
Removal, Plus New Money; Taxes,
Homeowners Ins

**DISCLAIMER**:
Auto Ins; Litigation Expenses; to be
produced as expeditiously as possible
before Pre-trial/Trial)

|  |  |  |
|---|---|---|
| | | ================ |
| Totals:Items (A)  #1, #2, #3, #4, #5 | | $   119,921.00 |

|  |  |  |  |
|---|---|---|---|
| A. Home Eqty Ln., NtionsBk 11/7/99 $20,001. $ | | | |
| B. Home Eqty Ln (10-17-00) | | $ 114,706.00 | $   114,706.00 |

C. MAJOR CREDIT CARD ACCOUNTS

|  |  |  |
|---|---|---|
| 1. Walmart/Wards | 1,743.00 | |
| 2. OfficeMax | 316.00 | |
| 3. Discover | 2,206.00 | |
| 4. Providian Visa | 1,247.00 | |
| 5. First USA, Visa | 8,915.00 | |
| 6. SAMS Club | 1,003.00 | |
| 7. Citibank M/card | 3,075.00 | 18,505.00 |

D. KNIGHTS of COLUMBUS INSURANCE

|  |  |
|---|---|
| 1. Policy #0100C77519 | 3,499.00 |
| 2. Policy #0101971909 | 333.00 |

   3.  Policy #0101334070 (Loss Px-0072)   35,057.00       38,889.00

E.  Family & Friends Financial Support
    Only Available Examples Attached
    1.  Sons and Daughters, Relatives
        a.  Manuel Rodriguez,    estimate ($8,000.00)
        b.  Frank Jr.,         estimate (   800.00)
        c.  Samuel Rodriguez,    estimate (  3,000.00)
        d.  Cynthia Carr,       estimate (  4,000.00)
        e.  Elizabeth Catlin,     estimate (  3,000.00)
    2.  Sister, Aurora Longoria,    estimate (  2,000.00)
    Sister-in-law, Maria Saldana, estimate (  2,500.00)
2.  Friends/coworkers
        a.  Abel Castaneda, coworker, estimate (  3,000.00)
        b.  Mary Castaneda, cowoker, estimate (  3,000.00)
        c.  Robert Stillman, friend   estimate (  3,000.00)

Total Liabilities: "A"; "B",; "C"; "D"   **$  224,764.00**    **$  322.657.00**

## LOSSES

### A.  PROTECTED PROPERTY LOSSES

| | | |
|---|---:|---:|
| 1. Property Appraised Value | $   100,221 | |
| Sold at a loss  [(Harrison St.) Px-0045] | | |
| a. Projected Income Loss (Px-135) | 75,600 | $  175.821.00 |
| 2 Loss of Property  ("J" St.) Px-0045 | 13,947 | |
| b. Projected Income Loss  (Px-135) | 24,300 | 38,247.00 |
| 3. Loss of Property  (Johnson St.) Px-0045 | 20,814 | |
| c. Projected Income Loss  (Px-135) | 32,400 | 53,214.00 |
| Total Protected Property Losses | | $  267,282.00 |

### B. LIFE INSURANCE POLICY

| | | |
|---|---:|---:|
| 1.. Loss of K of C Ins. Policy # 0101334070 | - 81,744 | |
| Loss A/L Term Ins. Protection Px-0072 | - 35,057 | $  116,801.00 |

============

Total Property and Insurance Loss

                                    ($  - 671,683.00)

### C.  LITIGATION EXPENSES

Plaintiff's Expenses for Litigating Cause B-95-150

| | |
|---|---:|
| Lodging | 610 |
| Car Rental | 853 |
| David E. Fast, Est.Legal exp. - Cause B-95-150 | 3,000 |
| Fred Galindo       Legal Exp. | 150 |
| Library Research and Coping | 991.00 |
| Defendants Martinez/Cortez – Depositions | 1,493 |
| Defts. Martinez/Cortez Depo.  Video Transcript | 119 |

4

| Computer    COPMPAQ | 885 | |
| Printer    XEROX | 162 | |
| Video Camcorder | 508 | 8,771.00 |

C. PLAINTIFF'S 1992 UNPAID EARNINGS, (Less
   Overtime – OT calculated separately).  [1992 Earnings, OT
   and Holiday pay has been challenged by plaintiff, and remain
   uncontroverted, with evidence of material fact, by the defendants]

| | | | |
|---|---|---|---|
| PP-08  80 hrs. | | 1,273.12 | |
| PP-09  40 hrs. | $ | 636.56 | |
| PP-12  40 hrs. | | 636.56 | |
| PP-12  Holiday pay | | 127.31 | |
| PP-13  80 hrs. | | 1,273.12 | |
| PP-14  80 hrs. | | 1,273.12 | |
| PP-15  80 hrs. | | 1,273.12 | |
| PP-15  Holiday pay | | 127.31 | |
| PP-16  80 hrs. | | 1,273.12 | |
| PP-17  8.85 hrs. | | 140.80 | |
| 1 Holiday pay charged against plaintiff by | | | |
| OPM, in prior pleadings/briefs | | 127.31 | |
| Total    (In Controversy) | 8,161.45 | 8,161.00 | 8,161.00 |

Grand Total Back Pay/Front Pay (1993-1997 Attached)    $    368,267.00

Grand total for wage earnings incl. OT less Medical    $    464,261.00
in prior pleadings/briefs

Grand Total    DAMAGES    $  1,155,429.00

**NOTE:** Legal and litigation expenses are not in included yet

# FRONT PAY/BACK PAY
## (2001 Revised)

### PLAINTIFF'S FRONT PAY AT 65 YEAR RETIREMENT AGE

| YEAR | Annual[1] | Mo OT[2] | Yr OT[3] | S/L Hrs[4] | A/L Hrs[5] | Benefits[6] | Hol[7] | Total[8] |
|------|-----------|----------|----------|------------|------------|-------------|--------|----------|
| **1993** | $ | $ | $ | $ | $ | $ | $ | $ |
| G-5 | 17,122 | 494 | +5,928 | +856 | +1,712 | +9,877 | +660 | 36,155 |
| G-6 | 17,593 | 508 | 6,096 | 880 | 1,760 | | 675 | 27,004 |
| **1994** | | | | | | | | |
| G-5 | 17,802 | 514 | 6,168 | 890 | 1,780 | 9,877 | 685 | 37,202 |
| G-6 | 18,281 | 527 | 6,324 | 914 | 1,828 | | 705 | 28,052 |
| **1995** | | | | | | | | |
| G-5 | 18,068 | 521 | 6,252 | 903 | 1,806 | 9,877 | 695 | 37,601 |
| G-6 | 18,552 | 535 | 6,420 | 928 | 1,855 | | 715 | 28,470 |
| **1996** | | | | | | | | |
| G-5 | 18,515 | 534 | 6,408 | 926 | 1,851 | 9,877 | 710 | 38,287 |
| G-6 | 18,999 | 548 | 6,576 | 759 | 1,900 | | 730 | 28,965 |
| **1997** | | | | | | | | |
| G-5 | 18,728 | 540 | 4,860 | 792 | 1,584 | 7,408 | 576 | 33,948 |
| G-6 | 19,219 | 554 | 4,986 | 813 | 1,626 | | 739 | 27,383 |
| Total front pay | (50o/o level-5, and 50o/o level-6 pay) | | | | | | | 323,067 |

Total back pay  in prior pleadings/briefs  (uncontroveted)              45,200

Grand total  -- front pay/back pay          (uncontroverted)        $ 368,267

---

[1] Plaintiff's dual-grade: 50% at Grade 5 (G-5), step 0; 50% at grade 6) step 0; with 20 hrs. G-5 & 20 hrs G-6 average monthly (Mo) estimated/projected for yearly (Yr.) front pay overtime (OT) work by plaintiff

1993 G-5 $34,243 @$16.46 p/h - $24,69 p/h OT
      G-6  35,185 @  16.92 p/h -  25.38 p/h OT
1994 G-5  35,604 @  17.12 p/h -  25.68 p/h OT
      G-6  36,561 @  17.58 p/h -  26.37 p/h OT
1995 G-5  36,135 @  17.37 p/h -  26.06 p/h OT
      G-6  37,104 @  17.84 p/h -  26.76 p/h OT
1996 G-5  37,029 @  17.80 p/h -  26.70 p/h OT
      G-6  37,998 @  18.27 p/h  - 27.41 p/h OT
1997 G-5  37,456 @  18.01 p/h -  27.01 p/h OT
      G-6  38,437 @  18.48 p/h -  27.72 p/h OT

[2] Mo OT  (projected)
[3] Yr OT  (projected)
[4] 104 yearly sick leave (S/L) hours earned
[5] 208 yearly annual leave (A/L) hours earned
[6] Estimated USPS-paid benefits based on obsolete 1990 data
[7] Holiday pay
[8] Yearly total earnings as planned for retirement absent retaliatory hostile environment

UNITED STATES DISTRICT COURT
SOUTJERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

FRANCISCO R. RODRIGUEZ      §
                Plaintiff,     §
                          §    Cause No. B-95-150
VS.                       §    Civil
                          §
UNITED STATES POSTAL SERVICE, §
                 ET AL §
           Defendants. §

ORDER

On the _____ day of _____, 2001 came on to be heard Plaintiff's added Supplemental Responses and Brief to his Third Amendment to Defendant's Motions to Dismiss, and it appearing to the Court, appropriate notice and opportunity has been given to defendants;

IT IS THEREFORE HEREBY ORDERED and the case be continued on to the Court's docket and said pleading/brief be made a part of the Court's record.

SIGNED this _____ day of _____, 20

44